IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DEAN JOSEPH TATUM                                                                                          PLAINTIFF

      v.                              Civil No.  5:15-cv-05254

SHERIFF TIM HELDER; and
DR. ROBERT SAEZ                                                                                          DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

      This is a civil rights action filed by Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff proceeds *pro se* and *in forma pauperis* (IFP).  Plaintiff contends his constitutional rights were violated when he was denied adequate medical care.

      Currently before the Court are two motions for summary judgment: the first motion (Doc. 20), was filed by Separate Defendant Sheriff Tim Helder; the second motion (Doc. 24), was filed by Separate Defendant Dr. Robert Saez.  As Plaintiff now lives out-of-state, he was offered an opportunity to submit a written response.  Plaintiff was provided with a questionnaire to assist him in responding to the motions for summary judgment.  His response (Doc. 32) was filed on December 5, 2016.[1]  The Defendants have been sued in their official capacities only.  The motions are now ready for decision.

      **1.  Background**

      Plaintiff currently resides in Anaheim, California.  The events at issue in this case occurred while Plaintiff was detained in the Washington County Detention Center (WCDC) in Fayetteville,

---

[1] Defendants object (Docs. 33 & 34) to the use of Plaintiff's response because he did not sign the questionnaire under penalty of perjury in the space provided on the last page of the questionnaire.  However, Plaintiff did sign the document two pages later at the conclusion of his written response and prior to his exhibits.  The Court will consider the response to have been made under penalty of perjury.

Arkansas.

Plaintiff was arrested on July 28, 2015, by the Anaheim police. He was booked into the Orange County Sheriff's Department. *Plaintiffs's Response (Doc. 32)*(hereinafter *Resp.*) at ¶ 6.

Plaintiff had been diagnosed with the following medical conditions: degenerative disc disease; rheumatoid arthritis; porphyria;[2] high blood pressure; and the Hepatitis C virus (HCV). *Resp.* at ¶ 8. Plaintiff was taking the following medications: Ribavirin and Harvoni for HCV; Lisinopril and Atenolol for blood pressure; Ondansetron for vomiting; Methadone and Hydrocodone or Norco[3] for partial pain relief; he was having phlebotomies to keep his ferritin levels down as treatment for porphyria; and he used Fluocinonide cream on blisters and/or sores caused by porphyria. *Resp.* at ¶ 9. He took all his medications with him when he was arrested. *Helder's Exhibit* (hereinafter *Helder's Ex.*) B at 38.

Plaintiff was diagnosed with HCV in 1983. *Resp.* at ¶ 61. At the time of his arrest, Plaintiff was very ill and was being treated for HCV. *Id.*

Plaintiff signed a form waiving extradition from the State of California. *Helder's Ex.* A-1 at 14. On August 5, 2015, a detainee extradition medical form was completed by Dr. C. Cheng. *Id.* at 15. It notes that Plaintiff was on Atenolol, Lisinopril, Harvoni, and Ribaviran. *Id.* It was also noted that Plaintiff had high blood pressure and an unspecified communicable disease. *Id.*

Dr. Richard Yip, a gastroenterologist, in a letter dated August 12, 2015, said that Plaintiff was on "medical treatment for Hepatitis C, requiring daily medication for 12 weeks. He must not

---

[2]"Porphyria refers to a group of disorders that result from a buildup of natural chemicals that produce porphyrin in your body. . . . Porphyria mainly affects your nervous system, skin and other organs."
http://www.mayoclinic.org/diseases-conditions/porphyria/basics/definition/con-20028849 (accessed January 26, 2017).

[3]Norco is a combination of hydrocodone bitartrate and acetaminophen.

miss or skip his treatment, and must have monitoring of liver function blood test and viral load." *Helder's Ex.* A-3 at 5. Dr. Yip indicated Plaintiff had been under his care since October 2014 and suffered from multiple medical conditions. *Id.*

Plaintiff testified, at his deposition, that he was told by Dr. Yip that he was dying. *Resp.* at ¶¶ 61 & 65. Plaintiff had only been taking the HCV medications for 34 or 35 days before arriving at the WCDC. *Id.* at ¶ 70. Plaintiff states the Orange County Health Care Agency provided a list of his various medications including the HCV medications. *Id.* at ¶ 71. The document included side effects of taking the medications as well as those caused by being taken off the medications. *Id.* at ¶¶ 72-73.

According to Plaintiff, his body retains ferritin and he must have a therapeutic phlebotomy, to remove two pints of blood, thereby bringing the ferritin level down. *Helder's Ex.* B at 61; *Saez Ex.* 1 at 58. His blood test on August 18, 2015, showed his ferritin level was at 381. *Helder's Ex.* B at 61. When his ferritin level is high he develops sores on his body and needs cream for his sores. *Id.* He was not getting the cream at the WCDC. *Id.* Because he has porphyria, exposure to the sun makes the blisters and sores worse. *Id.* at 62-63.

Dr. Scott Penkoff also wrote a letter indicating he had been caring for the Plaintiff since June of 2014. *Helder's Ex.* A-3 at 6. Dr. Penkoff indicated the Plaintiff was on pain medications because of the following: "Degenerative Disease of the Lumbar spine and Cervical spine; Thoracic spine Spondylosis; bullet fragments lying on this 4th and 5th Thoracic vertebrae." *Id.*

Dr. Penkoff indicated Plaintiff was on Methadone, 10 mg, 2 pills, every 8 hours and Hydrocodone/Acetaminophen, 10-325 mg, 1 pill, every 3 hours. *Id.* Dr. Penkoff stated his medical opinion was that Plaintiff needed "to continue these two medications to get partial relief of his

chronic pain. Suddenly discontinuing these medications will lead to severe withdrawal and possible medical emergencies." *Helder's Ex.* A-3 at 6; *see also Resp.* at ¶ 80.

According to Plaintiff, he had advanced cirrhosis of the liver that was terminal, heart and blood pressure problems, and degenerative disc disease, as well as bullet fragments lodged in his upper left lumbar spine. *Helder's Ex.* A-2 at 1. He was booked into the WCDC on August 22, 2015, on a probation violation. *Helder's Ex.* A-1 at 16; *Resp.* at ¶ 11. When he was booked in, it was noted that he had problems with his liver and back. *Helder's Ex.* A-1. at 19. He had the following medications with him: Blistex; Fluocinonide; Clobetasol cream; Methadone; Hydrocodone; fiber tabs; and Ondansetron. *Id.*

According to Plaintiff, Defendants refused to provide him with his liver medications, Harvoni and Ribavirin, based on cost alone. *Helder's Ex.* B at 30.[4] Plaintiff indicates he was on a 120 day treatment plan for HCV that cost approximately $90,000. *Id.* at 36. He alleges he was told that Defendants would not provide that treatment. *Id.*

As a result of not having his medications, Plaintiff contends he went through horrible pain and physical discomfort including vomiting and sores on his arms and legs. *Resp.* at ¶ 77. He said it "felt lik[e] a hot ice pick was run up my spine and had to stay out of bed on concrete for 14 hrs. or more a day." *Id.*

Fortunately, in October, it was determined that Plaintiff no longer had HCV. *Helder's Ex.* B at 63-65. However, he said at the time he was being denied the medication, he thought he was dying. *Id.* at 64. Because the medicine worked for the short time he received it, Plaintiff testified

---

[4] Helder's Exhibit B is the Plaintiff's deposition. Page citations are to the deposition page number and not the CM/ECF page number.

he did not suffer any physical harm as a result of not receiving the HCV medication. *Id.*

Plaintiff also maintains Dr. Saez, who is employed by Southern Health Partners (SHP), Inc., the contract medical provider for the WCDC, took him off his pain medication because of the jail policy prohibiting narcotic pain medications. *Helder's Ex.* B at 64-65. At a minimum, Plaintiff believes he should have been given an analgesic such as Tramadol for his joint pain. *Id.* at 64 & 66.

Plaintiff states he was told he would not be allowed to have the Hydrocodone that was in his property out of concern that he could possibly sell them or give them to other inmates. *Helder's Ex.* B at 66. As a result of not being given pain medication, Plaintiff testified he suffered severe pain in his spine and neck. *Id.* He said his "vertebrae rub together without a cushion." *Id.* He discussed this with Dr. Saez and he said he was not allowed to give pain medication. *Id.* Instead, Dr. Saez prescribed Gabapentin which is a nerve pain medication and Naproxen. *Id.* at 67; *Saez Ex.* 2. According to Plaintiff, Dr. Saez said he was "not going to discuss even Tramadol or anything that you want to have because you're not getting it in jail." *Helder's Ex.* B at 67. Plaintiff states he was told that his former medications would not be allowed under Sheriff Helder's guidelines. *Resp.* at ¶ 14. Plaintiff indicates that he continued to experience severe pain on the medications prescribed by Dr. Saez. *Id.* at ¶ 13.

Plaintiff testified that because of his porphyria, he develops lesions on his skin. *Helder's Ex.* B at 71-72. When he develops the lesions depends on his "ferritin level, and how much I'm outside, and stress level and all that." *Id.* at 72. Prior to being booked into the WCDC, he did have some lesions. *Id.* He also testified that he was told he would have to be dying before Defendants would prescribe anything for porphyria. *Saez Ex.* 1 at 58.

Plaintiff's jail medical records indicate he was continued on Atenolol and Lisinopril. *Helder's Ex.* A-3 at 64. On August 23, 2015, he requested a second mattress. *Helder's Ex.* A-2 at 2. He noted he had compression sores on his hips from excessive muscle and weight loss from cirrhosis of the liver. *Id.* He also stated that he was not receiving his liver medication. *Id.* Plaintiff kept another mattress when an inmate left and used it for additional padding. *Resp.* at ¶¶ 21-22.

Plaintiff testified he weighed 127 pounds when booked into the WCDC and was approximately 172 pounds when he was released. *Helder's Ex.* B at 73. Plaintiff states when he arrived at the WCDC he had been dying from HCV. *Id.*

On August 24, 2015, Plaintiff indicated he had received his heart and high blood pressure medications. *Helder's Ex.* A-2 at 1. He also noted that he had not received his special diet even though he was told it was in the computer. *Id.* He indicated he was to receive double portions to replace Resource 2.0 protein shakes that were previously prescribed to him by his doctor. *Id.*

On August 24, 2015, Plaintiff states the jail medical staff did not know where to get his medication and he asked them to lie and defraud his insurance company in California in order to get him his liver medications, Ribavirin and Harvoni. *Helder's Ex.* A-2 at 3; *Resp.* at ¶¶ 23-25. He stated he was told that Washington County could not afford the $22,000 bill for his medications. *Id.* He also indicates he was asked to have his medications sent to his address in California and then to have his family ship the medications to the WCDC. *Id.* He refused to involve his family in what he believed was a criminal act. *Id.*

On August 25, 2015, Plaintiff's mother wrote to the Washington County Sheriff informing the Sheriff that her son was dying and needed his HCV medication. *Resp.* at ¶ 26. She stated he had

received his medication at his previous two facilities. *Id.* She wrote that she hoped her son did not die while in their custody. *Id.* Copies of the letter were sent to Dr. Saez and Nurse Phoebe. *Id.* at ¶¶ 27 & 89.

On August 26, 2015, Plaintiff was seen for complaints of sores on his left ankle caused by shackles. *Helder's Ex.* A-3 at 34. It was noted that there was swelling from his knee to his big toe and two stage three ulcers to the outer left ankle. *Id.* He was given Bactrim three times daily for the infection and Naproxen for chronic pain. *Id.* He was moved to an isolation cell and the wound was to be cultured for Methicillin Resistant Staphylococcus Aureus (MRSA). *Id.* at 38. The results of the culture showed a "light growth" of MRSA. *Id.* at 40.

On August 28, 2015, Plaintiff complained that he had been put in isolation in "direct punishment for my family contacting the Sheriff." *Helder's Ex.* A-2 at 4. He stated there was no water and no toilet in the room for bowel movements. *Id.* Further, he stated they refused to treat the injury to his left ankle caused by the shackles until his foot was swollen and he could barely walk. *Id.* On August 28, 2015, Plaintiff was prescribed Gapaentin and a topical cream. *Helder's Ex.* A-3 at 65; *Saez Ex.* 2-A. Plaintiff states he was not given his prescribed cream but instead given one that Dr. Saez indicated "does everything." *Resp.* at ¶ 44.

On August 30, 2015, Plaintiff submitted a grievance stating he was not getting his low sodium double portion diet that had been prescribed for medical reasons. *Resp.* at ¶¶ 30-31. He stated that trustees frequently stole his tray with the knowledge of the officers. *Id.*

On September 6, 2016, Plaintiff submitted a grievance asking to be moved back to a barracks. *Resp.* at ¶¶ 32-33. In isolation, Plaintiff states he was assigned to a cell where he was

locked out all day and could not lay down. *Id.*

On September 10, 2015, Plaintiff alleges Dr. Saez refused to treat porphyria because it was not life threatening. *Helder's Ex.* A-2 at 5; *Resp.* at ¶¶ 34-35. Plaintiff had asked that lab work be done every two weeks. *Id.* Plaintiff was told his grievance would be forwarded to the SHP supervisor, Robyn Sims. *Helder's Ex.* A-2 at 6.

On September 12, 2015, Plaintiff submitted a grievance about not receiving his liver medication. *Resp.* at ¶ 36. The grievance was forwarded to SHP. *Id.*

On September 13, 2015, Plaintiff submitted a grievance complaining that he did not receive a tray that was low sodium and had double portions. *Id.* at ¶ 37. He stated that the servers needed to be informed of his diet so he did not go hungry. *Id.*

On September 21, 2015, Plaintiff complained he was receiving nerve medication for pain in his lumbar spine caused by bullet fragments. *Helder's Ex.* A-2 at 6; *Resp.* at ¶¶ 39 & 44. He also said he was provided athlete's foot cream for his porphyria which was unacceptable. *Id.* He stated that the correct medication was in his property. *Id.* In response, R. Sims stated she would talk to him that day. *Id.* Plaintiff states he does not recognize the name and did not talk to her. *Resp.* at ¶ 40.

On September 22, 2015, Plaintiff submitted a grievance stating SHP was not answering his requests. *Resp.* at ¶ 42. He requested a § 1983 complaint form. *Id.* He was given the address to obtain the form. *Id.*

On October 3, 2015, Plaintiff wrote that he was still receiving the incorrect medication for joint pain and that the doctor refused to provide cream for his porphyria. *Resp.* at 45. On October

9, 2015, blood tests were ordered to determine Plaintiff's Hepatitis C viral load and serum ferritin. *Helder's Ex.* A-3 at 47.   On the hepatic function panel everything was within normal range except for alkaline phoshatase, which was slightly lower than normal range.   *Id.* at 48.   According to Dr. Saez, alkaline phoshatase is a liver enzyme and the reading of 38 U/L "is slightly below the normal range but has no clinical significance."   *Saez Ex.* 1 at ¶¶ 27-28.   Plaintiff's ferritin level was 106 ng/ml, which was at the lower end of the normal range.   *Resp.* at ¶ 52.   Plaintiff believes it should not have taken two months for his blood tests to be ordered.   *See e.g., Resp.* at ¶¶ 55-56.

Blood tests were again ordered on October 22, 2015.   *Helder's Ex.* A-3 at 53.   The test results show that "the Hepatitis C Virus was not detected" in Plaintiff's blood.   *Saez Ex.*1 at ¶ 24.

Plaintiff continued to complain about not receiving his medication.   On October 28, 2015, Sims said she would put the Plaintiff on doctor call so he could go over Plaintiff's labs and discuss Plaintiff's issues.   *Resp.* at ¶ 55.

On November 10, 2015, Plaintiff stated that he would not be satisfied until he was back on his prescribed medication from a doctor who was not a puppet for Sheriff Helder.   *Resp.* at ¶ 59.   On November 16, 2015, a fax was received from Deputy Prosecuting Attorney Sara Swearengin stating that she, the clerks, and Judge Casey Jones all agreed that Plaintiff should be released that day. *Helder's Ex.* A-1 at 20. Upon his release, Plaintiff's medication was returned to him.   *Id.* at 22.

During his incarceration at the WCDC, Plaintiff received Atenolol, Lisinopril, Milk of Magnesia, Bisacodyl, Naproxen, Bactrim, Chlordiazep, a multi-vitamin, Thiamine, Gabapentin, and Triamcinolone cream.   *Helder's Ex.* 3 at 67-74.

Plaintiff alleges that Dr. Saez denied him pain medication that Plaintiff needed to relieve

joint pain and prescribed the "incorrect nerve pain medication." As a result, Plaintiff asserts that he suffered constant back and nerve pain.

Dr. Saez indicates that Gabapentin is used to treat neurogenic pain. *Saez Ex.* 1 at ¶¶ 17-18. "Neurogenic pain is caused by damaged or compressed nerves, such as might be found in degenerative joint disease. *Id.* at ¶ 18. Dr. Saez notes that he also prescribed Naproxen, which is a non-steriodal anti-inflammatory drug used to reduce inflammation and pain. *Id.* at ¶ 19. The WCDC written policy with respect to medication brought to the facility, states that "if a detainee was admitted with medication on his person, the prescription [must be] verified and approved by the nurse before it is administered." *Helder's Ex.* A-4 at 3.

By affidavit, Sheriff Helder states he makes no decisions or recommendations "as to specific medical care provided to any particular inmate. I am not familiar with the Plaintiff's medical care." *Helder's Ex.* C at ¶ 5. He indicates that "[a]ll decisions regarding medications, medical testing, or medical treatment are left to the professional medical judgment of the physician at the detention facility." *Id.* at ¶ 6.

Plaintiff has no evidence suggesting his porphyria was life-threatening while he was at the WCDC. *Saez Ex.* 1 at 58. Usually he underwent therapeutic phlebotomies every two weeks during which they would remove two pints of blood. *Saez Ex.* 1 at 58-59. Plaintiff testified he underwent a phlebotomy whenever his ferritin level was over 133 to try to keep his skin from blistering in the sun. *Saez Ex.* 1 at 59. His skin did not blister while at the WCDC because he was never in the sun. *Id.* He did, however, have some lesions because of his ferritin level. *Id.* at 62; *Resp.* at ¶ 47. Plaintiff testified he was not getting the cream to treat his sores. *Saez Ex.* 1 at 62. Plaintiff indicated

he experienced pain and suffering from blisters, and sores, as well as scars on his skin because Dr. Saez did not perform therapeutic phlebotomies and did not give him the correct cream. *Ex.* B at 61-63.

In Dr. Saez's opinion, Plaintiff was not a good candidate for a therapeutic phlebotomy given the most recent lab report showed he had a hemoglobin level of 9.9 grams and a hematocrit of 30.3%. *Saez Ex.* 2 at ¶¶ 6-7; *Saez Ex.* 2-A. According to Dr. Saez, these levels indicate Plaintiff was borderline anemic. *Saez Ex.* 2 at ¶ 10. Removing two pints of blood, in Dr. Saez's opinion, could "have caused severe and potentially life-threatening anemia." *Id.* at ¶ 11. Dr. Saez also notes that blood test results in October 2015 indicate that his ferritin level was 106 ng/ml or at the lower end of the normal range for ferritin. *Id.* at ¶¶ 13-15; *Saez Ex.* 2-A. Plaintiff points out that Dr. Saez ignored the August 18, 2015 lab results from the Santa Anna County Jail showing his ferritin level was 381. *Helder's Ex.* B at 61; *Resp.* at ¶ 91.

By affidavit, Janet Stephens, Vice-President of Quality Assurance for SHP, states that SHP has no "policy or custom that prohibits an inmate/patient from undergoing therapeutic phlebotomy for the treatment of porphyria." *Saez Ex.* 3 at ¶ 5. Further, she indicates there is no policy or custom of withholding treatment until a condition becomes life threatening. *Id.*

With respect to pain medication, Stephens states that SHP has no "policy or custom that prohibits an inmate/patient from being prescribed any medication that the jail doctor deems appropriate." *Saez Ex.* 3 at ¶ 7. She asserts that SHP gives its doctors "complete discretion and autonomy to make medical decisions that are in the best interest of each individual patient, without regard to cost considerations." *Id.* at ¶ 8.

### 2. Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing, Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3. Discussion

"Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." Crooks v. Nix, 872 F.2d 800, 804 (8th Cir. 1989)(citing Estelle v. Gamble, 429 U.S. 97, 103 (1976)). The Eighth Amendment deliberate indifference standard applies to all denial of medical care claims. Carpenter v. Gage, 686 F.3d 644, 650 (8th Cir. 2012). The deliberate indifference standard has both an objective and a subjective component. Coleman v.

Rahija, 114 F.3d 778, 784 (8th Cir. 1997). A plaintiff must demonstrate that (1) he suffered an objectively serious medical need; and (2) the defendant actually knew of the medical need but, subjectively, was deliberately indifferent to it. Grayson v. Ross, 454 F.3d 802, 808-09 (8th Cir. 2006).

### (A). Sheriff Helder's Summary Judgment Motion

Plaintiff sued Sheriff Helder in his official capacity only. Sheriff Helder moves for summary judgment because there is: (1) no proof of any unconstitutional policy, practice, or custom implemented by Sheriff Helder that violated Plaintiff's rights; and (2) there is no proof the Plaintiff was injured by the alleged denial of certain medications.

Sheriff Helder may be held liable if a policy or custom of Washington County was the moving force behind the alleged constitutional violation. A Plaintiff "seeking to impose liability on a municipality under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997). "There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." Moyle v. Anderson, 571 F.3d 814, 817-18 (8th Cir. 2009) (citation omitted); Jenkins v. County of Hennepin, 557 F.3d 628, 633 (8th Cir. 2009)(Plaintiff must point to "any officially accepted guiding principle or procedure that was constitutionally inadequate."

Sheriff Helder points out that the jail had contracted with a medical care provider, SHP, during the times relevant to this case. Sheriff Helder argues that other than Plaintiff's bare allegation that he did not get his liver medications because of a county policy, there is no evidence of any

-13-

policy, practice, or custom by which Washington County exercised any control over the medical decisions.  In particular, Sheriff Helder asserts that all decisions regarding medications, medical testing, or medical treatment are left to the professional medical judgment of the physician at the detention facility.  Sheriff Helder asserts that it was completely up to the jail medical staff to ensure inmates received appropriate medical attention.  Furthermore, even if such a policy existed, Sheriff Helder argues the Plaintiff suffered no injury as a result of the claimed deprivation.  In fact, Plaintiff was cured of HCV for which he had been taking the medications.

I believe there is a genuine issue of material fact as to whether a custom or policy of Washington County resulted in the Plaintiff being denied treatment for HCV based on its expense and being denied his prescription pain medication based on a policy of not allowing narcotic pain medication at the facility.  Construing the facts, as we must, in the light most favorable to the Plaintiff, I believe he has pointed to sufficient evidence in the record to suggest he may have been denied treatment and/or prescription medication based on a custom or policy of Washington County. Avalos v. City of Glenwood, 383 F.3d 792, 802 (8th Cir. 2004)("[A] municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional policy or custom"); Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987)(prison officials may not condition medical treatment on the inmate's ability or willingness to pay); Kruger v. Jenne, 164 F. Supp.2d 1330, 1336 (S.D. Fla. 2015)(inmate stated § 1983 claim when she alleged medical provider denied recommended treatment based on cost cutting policy); Cody v. Hillard, 599 F. Supp. 1025, 1041 (D.S.D. 1984)("It is improper to deny an inmate medical treatment based solely on the cost of treatment"); Horn v. Jones, No. 14-20341-CIV, 2015

WL 3607012, *6 (S.D. Fla. May 8, 2015)("Saving money is not a medical justification to delay treatment. Plaintiff's allegations that necessary medical care was delayed or denied because of non-medical reasons such as cost containment are sufficient to survive a motion to dismiss"); cf. Honeycutt v. Mitchell, CIV-08-140-W, 2009 WL 14214444 (W.D. Okla. April 3, 2009)("Cost is a legitimate consideration, and the constitution permits officials to decline certain kinds of expensive treatment if they provide adequate medical care").

Sheriff Helder also argues that Plaintiff's claims are subject to dismissal as he suffered only *de minimis* injury. See Memphis Community School Dist. v. Stachura, 477 U.S. 299, 307 (1986)("[w]here no injury was present, no compensatory damages could be awarded"). I believe Plaintiff has alleged that he suffered more than a *de minimis* injury. While he may have been "cured" of HCV, he suffered from sores caused by porphyria. He maintains he was in extreme pain and had pressure sores. These adverse health effects are sufficient to constitute more than a *de minimis* injury.

Additionally, the physical injury requirement of the Prison Litigation Act, 42 U.S.C. § 1997e(e) only serves as a limitation on the types of damages recoverable. Royal v. Kautzky, 373 F.3d 720, 722-723 (8th Cir. 2004). Absent a physical injury, a prisoner may not recover for mental or emotional injury. *Id.*

### (B). Dr. Saez's Summary Judgment Motion

Dr. Saez argues there is no basis for official capacity liability as no policy or custom of SHP was unconstitutional or was the moving force behind any alleged harm Plaintiff suffered. He also contends Plaintiff suffered no actual injury.

I believe there are genuine issues of material fact as to whether SHP had a policy, practice, or custom of not prescribing narcotic pain medication to inmates at the WCDC. Further, I believe there is a question of fact as to whether Plaintiff's HCV medical treatment was discontinued and/or not restarted because of the cost of the medication. See e.g., Jenkins, 557 F.3d at 633 (a policy that results in delayed treatment is unconstitutional if it "evinces deliberate indifference to serious medical needs"); Hartsfield v. Colburn, 371 F.3d 454, 457-58 (8th Cir. 2004)(inmate may not be denied medical care because of its cost or inmate's inability to pay). As discussed above, I believe the Plaintiff has sufficiently alleged the existence of an actual injury.

### 4. Conclusion

For the reasons stated, I recommend that Defendant Helder's summary judgment motion (Doc. 20) be denied. Further, I recommend that Defendant Saez's motion for summary judgment (Doc. 24) be denied.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of February 2017.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE